# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE<br><br>                Plaintiff,<br><br>v.<br><br>PENNRIDGE SCHOOL DISTRICT, AND JACQUELINE A. RATTIGAN AND GINA DEBONA, in their official and individual capacities,<br>                Defendants. | Case No.        17   3570<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Jane Doe, by and through her attorneys, alleges the following on information and belief:

## INTRODUCTION

1.     Miss Doe, like all high school students attending federally funded institutions, had a statutory and constitutional right to equal access of her institution's educational opportunities. Pennridge School District, Superintendent Jacqueline Rattigan ("Rattigan"), and Principal Gina DeBona ("DeBona"), who had actual knowledge of the severe and pervasive sex-based harassment to which Miss Doe was subjected, created a sexually hostile environment when they failed to appropriately address the harassment. By acting with deliberate indifference to that knowledge, Pennridge School District, Rattigan, and DeBona deprived Miss Doe of her constitutional rights in violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a). Pennridge School District, Rattigan, and DeBona also violated Miss Doe's rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, as well as tort law for the intentional infliction of emotional distress.

2.      When Miss Doe was a sophomore at Pennridge High School (PHS), she was
physically and verbally harassed by D., her boyfriend and his friends. Miss Doe was traumatized
and, as a result of the violence she experienced, suffered from post-traumatic stress disorder
(PTSD). Because Miss Doe attended the same school as her harassers and she suffered sex-based
harassment on school grounds, she turned to the school's senior administration, asking the
officials to help her. Not only did PHS's administrators fail to adequately investigate the
violence, but they also repeatedly failed to take even the most basic steps to accommodate Miss
Doe continuing to learn in a safe educational environment at PHS.

3.      PHS's failure to respond to Miss Doe's repeated reports of sex-based harassment
only compounded matters by creating an environment that empowered her abuser and his friends
to retaliate against Miss Doe for reporting the sex-based harassment. After Miss Doe reported the
relationship abuse to PSD officials, D. and his friends embarked on a nearly two-year-long
campaign of physical and verbal sex-based harassment against her, calling her a "bitch" and a
"whore" and threatening to physically assault her. D.'s violence against Miss Doe also escalated,
including physically assaulting her on PHS school grounds.

4.      Over the course of two years, Miss Doe and her family continued to report the
sex-based harassment, including the physical assault, to Pennridge School District ("PSD")
officials, including Superintendent Rattigan Principal DeBona. Officials repeatedly told Miss
Doe that PSD could not help her.

5.      Eventually, in the spring of her junior year, PSD officials effectively gave Miss
Doe no choice but to attend Twilight Academy, an "alternative school" with a student population
consisting primarily of expelled students and students who had behavioral challenges. There,
Miss Doe received six hours of instruction per week. Her work consisted of silently filling out

2

assignments packets next to four students in different grades. Miss Doe finished her high school education in a month and a half.

6.     As a direct result of PSD administrators' lack of response to the sex-based harassment she suffered, Miss Doe missed significant class time, dropped out of extracurricular activities, and her GPA plummeted.

7.     As Miss Doe has since learned, PSD and its administrators have repeatedly refused to investigate victims' claims and encouraged victims to drop out of PHS. PSD has a pattern and practice of sweeping sex-based violence under the rug.

8.     PSD, Superintendent Rattigan, and Principal DeBona—who had actual knowledge of the severe and pervasive sex-based harassment to which Miss Doe had been subjected—created a sexually hostile environment when they failed to address the harassment appropriately. In doing so, PSD and its administrators subjected Miss Doe to sex-based harassment and deprived her of equal access to educational opportunities in violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a). PSD and its employees also violated Miss Doe's rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, as well as tort law.

## JURISDICTION

9.     This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343, and 2201 as this is a civil action arising under the Constitution and laws of the United States. This Court has jurisdiction over supplemental claims arising under Pennsylvania law pursuant to 28 U.S.C. § 1367(a).

3

10.    Venue lies in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because at least one defendant is a resident of the Eastern District of Pennsylvania. Venue also lies in this district pursuant to 28 U.S.C. § 1391(c) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

11.    Miss Doe is an 18-year-old recent graduate of Pennridge High School.

12.    Pennridge School District is a public school district in Perkasie, Pennsylvania that encompasses Pennridge High School. PSD receives federal funding.

13.    Jacqueline Rattigan is the Superintendent of PSD. She has served as Superintendent and a final policymaker since 2013. A final policymaker is an individual who is empowered with final authority over certain policies within PSD. Pursuant to PSD's policy, the Superintendent makes final decisions regarding a number of matters, including expulsions for repeated physical assaults and aggressive behavior.

14.    Gina DeBona is the Principal of PHS. She has served as Principal since 2014. DeBona was a final policymaker empowered to make, review, and approve final decisions about her school's functions. PSD policy grants unreviewable discretion to the principal in resolving harassment complaints.

## FACTS

15.    Miss Doe was a student at Pennridge School District schools from kindergarten through her recent graduation from high school.

4

16.    Miss Doe was a strong student, earning As and Bs in her classes. She also participated in Color Guard, cheerleading, and her local Girl Scout troop. Miss Doe's favorite activity was her afterschool Junior Police course, where she learned about law enforcement. She looked forward to the class all week.

*D. Physically and Verbally Abused Miss Doe*

17.    During the 2014-2015 academic year, when Miss Doe was a sophomore at PHS, her boyfriend, D., a junior at the same school, began to physically and verbally abuse her. D. insisted on knowing Miss Doe's location and activities at all times. Controlling and prone to jealousy, D. set a "rule" that Miss Doe could not be friends with other boys and would berate her for so much as talking to one. As a result of the abusive relationship, a form of sex-based violence, Miss Doe was eventually diagnosed with PTSD by a psychiatrist.

18.    In or around March or April 2015, D. physically attacked Miss Doe inside her home in a fit of control and jealousy. During an extended encounter, he hit her, bit her, shoved her, and held her down so she could not escape. D. left a large bruise on her shoulder, of which Miss Doe took a picture.

19.    Soon after the attack, Miss Doe broke up with D. because of his abuse.

20.    After Miss Doe broke up with D., he continued to harass Miss Doe both in and out of school. D. called her names and frequently harassed her using social media accounts. When she would block him, he would create a new account. Often, D. would send the messages via Snapchat, which deletes messages shortly after they are read. D.'s friends also harassed Miss Doe both on and off PHS's campus, calling her sex-based epithets like "whore" and "bitch." Starting in April 2015, Miss Doe consistently reported these incidents to PHS administration in hopes they would help her.

5

21.     Between April and June 2015, Miss Doe and her parents repeatedly reported the sex-based harassment to Principal DeBona, Assistant Principal Scott Hegen ("Hegen"), who was the principal for the sophomore class, and Erik Henrysen, the guidance counselor. Miss Doe would often report sex-based harassment two or three times a week, and sometimes two or three times per day, because the harassment occurred with such frequency. Miss Doe and her parents also met with these same PSD administrators about the harassment on multiple occasions. During one of these meetings, Miss Doe provided the picture of the large bruise she had on her shoulder from D.'s assault. The school officials did not offer to follow up or sanction D., but instead merely told Miss Doe to stay away from the boy who was harassing. Hegen, despite never even investigating the claims, regularly told Miss Doe that she was lying when she claimed D. assaulted her and that she was simply heartbroken. In multiple meetings, Hegen—who apparently deemed the photograph documenting one of Miss Doe's injuries insufficient evidence of the violence—demanded even more evidence of the abusive conduct before he would act.

22.     Upon information and belief, PSD has a custom or practice of not investigating or disciplining reports of sex-based harassment, which includes relationship abuse.

23.     Miss Doe finished her sophomore year terrified to go to school because of D. and his friend's harassment. As a result, she when she finished her sophomore year, she had missed dozens of days of school and her grades began to slide from As and Bs to Cs and Ds.

*On and Off Campus Harassment Continued During Miss Doe's Junior Year*

24.     Over the summer after her sophomore year, Miss Doe no longer had to attend school with D. and the harassment stopped. Miss Doe returned to PHS hopeful that the worst of the harassment had passed. When she returned to PHS, though, the school failed to take any steps to ensure a safe academic environment for Miss Doe and the harassment promptly

6

resumed. During September and October of 2015, D. followed Miss Doe around PHS, harassed her using social media, like Snapchat, and threatened to hurt himself or her.

25.     In addition, nearly every day, D.'s friends harassed Miss Doe on and off school property in retribution for breaking up with D. They called her gender-based epithets like "whore" and "bitch," and told her she was fat, ugly, and a "waste of human space." D.'s friends also repeatedly threatened to physically assault Miss Doe.

26.     Because of this harassment, Miss Doe would walk the hallways between classes only if male friends escorted her. She regularly missed one or two days of school a week and routinely left early on the days when she did attend. By this time, the former A and B student was consistently receiving Cs and Ds.

27.     In or around October 2015, Miss Doe once again reported the harassment by D. and his friends to Hegen and Henrysen. After hearing Miss Doe's story, Hegen and Henrysen told her they would "look into it." However, they wrongly told Miss Doe that they could do no more than talk to D. and ask him to stop.

28.     After Miss Doe's report in October 2015, Hegen talked to D. and told him to stop harassing Miss Doe. However, Hegen explained to D. that, while he was compelled by school policy to raise the issue with D., Hegen believed that, in actuality, Miss Doe was being overdramatic—thus undermining the impact of the directive he had just delivered.

29.     After Hegen had this conversation with D., in which he minimized Miss Doe's allegations, D. and his friends continued their harassment both on and off campus. D. repeatedly threatened to hurt himself or Miss Doe if she would not date him. D's friends continued to taunt Miss Doe with gender-based epithets, blame her for D.'s threats of self-harm, and threaten to "find" and "jump" her.

7

30.     Miss Doe repeatedly reported D.'s harassment to Hegen and Henrysen. Her parents and grandmother called and met with PSD officials multiple times.

31.     During one such meeting with Miss Doe's father during the winter of Miss Doe's junior year, Hegen, relying on pernicious and offensive sex-based stereotypes, said he would not take action to protect Miss Doe because she was a "drama queen" and "crazy." Hegen also said the responsibility to avoid D. was Miss Doe's; she should, he said, simply "walk away."

32.     Shortly thereafter, Miss Doe reported these comments to Principal DeBona, to whom she frequently complained of Hegen's inaction.

33.     In or around February 2016, D. tried to strike Miss Doe in her face on school grounds while she was walking on PHS's third floor on her way to her first period class, less than 100 feet from PHS's administrative office. Miss Doe shouted for help. None arrived.

34.     Miss Doe ran to Henryson's office and wrote an incident report to describe D.'s attack. Later that day, Henrysen and Hegen called Miss Doe to Hegen's office for a meeting. There, Hegen explained that PSD could take no action in response to the attack because the school's security camera did not cover the location of the assault. PSD conducted no investigation—not even calling D. to the office for a discussion of the alleged events.

35.     While Miss Doe cried in Hegen's office, Hegen called her parents to request a meeting, which occurred the following week. There, he told Miss Doe's parents that their child was "crazy" and a "misguided kid." He insisted that her parents sign Miss Doe up for a program for kids with behavioral and disciplinary problems, as though Miss Doe was responsible for the harassment she was suffering.

36.     The harassment continued on a near-daily basis. PSD continued to shirk its responsibility to intervene. By March 2016, Miss Doe had reported the harassment she suffered

at D. and his friends' hands to PSD officials no fewer than 50 times. As a result of PSD officials'
refusal to protect Miss Doe from D. and his friends, she continued to regularly miss one or two
days of school a week and leave early when she did attend. She would often cry in PHS's nurse's
office.

37.    PSD policy, as written and published, grants unreviewable discretion to its
principals in resolving harassment complaints, rendering Principal DeBona a final policymaker
on these matters. DeBona, in her capacity as a final policymaker, decided not to take any action
responding to Miss Doe's report of harassment or helping ensure her access to an equal education
in a safe and respected environment.

38.    Hegen repeatedly told Miss Doe and her family that Principal DeBona was aware
of all developments and approved of his chosen course. On two occasions, DeBona met with
Miss Doe and her parents. DeBona reiterated Hegen's assertions that she was aware of the
complaints and that PSD could not intervene to protect Miss Doe's safety and education.

*After Miss Doe Repeatedly Reported the Abusive Behavior to PSD, Agents of PSD
Transferred Her to Twilight, an Objectively Inferior Academic Program*

39.    In or around March 2016, Miss Doe's parents requested a meeting with
Superintendent Rattigan. Rattigan refused to meet with the family but instructed that Troy Price,
the PSD administrator in charge of student affairs, attend. Miss Doe's mother met with Price.
She complained about Hegen's mishandling of the reports and requested that D. be separated
from Miss Doe or, preferably, removed from PHS for her safety. Price said he would relay the
request back to Rattigan.

40.    Shortly afterward, Miss Doe and her parents met with Hegen and Henrysen.
Hegen explained he knew that Miss Doe's mother had met with Price and that Price had relayed
her concerns to Rattigan. Hegen then explained that the PSD administrator had decided Miss

9

Doe had only two options: she could remain at PHS without any additional accommodations or protections or *she*, rather than D., would be removed from PHS and placed into Twilight. Hegen said he had "had enough" of hearing Miss Doe's "complaints."

41.    As Miss Doe would later learn, PSD has a custom and practice of encouraging or forcing girls who report sex-based harassment out of PHS and into Twilight, or some other alternative and inferior form of schooling that is generally attended by students who drop out or have behavioral issues.

42.    Miss Doe did not want to leave PHS, but she and her parents felt they had no choice: if PSD would not protect Miss Doe from D. and his friends, she had to leave.

43.    As a Twilight student, Miss Doe received only six hours of class time per week. There, a teacher provided her with assignment packets that covered classes she had taken in eighth and ninth grade. Rather than lead discussions or lecture the class, the teacher instructed Miss Doe to "Google the answers" to questions in the packets. Only five students attended Twilight, and none were in Miss Doe's year. As a result, she was deprived of important social connections. The five Twilight students were confined to a single classroom and forbidden from walking around the school. Miss Doe, the victim, was isolated while her harassers were free to roam the halls and learn.

44.    Because of the simplicity of Twilight's curriculum, Miss Doe completed her high school education in a month and a half.

45.    On June 8, 2017, Miss Doe graduated from PHS, over a year since she had taken a class. In the fall, Miss Doe will attend Bucks County Community College to study psychology. She hopes to someday be a mental health counselor.

*After Leaving Twilight, Miss Doe Learned of Other Similarly Situated Students at PHS*

10

46.     Since leaving Twilight, Miss Doe has learned of multiple other students with similar experiences at PHS. Multiple former students, going as far back as 2005, reported sex-based harassment to PSD officials who refused to investigate and to intervene in order to keep the victims safe and in school, as they are required to do by federal law. PSD officials encouraged almost all of these girls to leave PHS for Twilight. All, eventually, dropped out of PHS, either permanently or for many months.

47.     Two of these former PHS students, Modupe Williams and DarbiAnne Goodwin, have already filed suit against PSD and its officials. PSD officials told Miss Williams, Miss Goodwin, and their mothers that the school could not take action to protect them from the ongoing harassment – which included, in Miss Goodwin's case, a rape. PSD officials refused to separate either Miss Williams or Miss Goodwin from their harassers. PSD officials encouraged both Miss Williams and Miss Goodwin to attend Twilight. Both girls dropped out of PHS for periods of time.

48.     Miss Goodwin and her mother repeatedly brought concerns about how PSD officials handle reports of sex-based harassment to Superintendent Rattigan and Principal DeBona. They regularly included Rattigan and DeBona on emails regarding (i) Miss Goodwin's continued harassment at the hands of her rapist and his friends, (ii) Hegen's failures to respond appropriately, and (iii) her ultimate decision to drop out of PHS for her safety. At one point, Rattigan advised Miss Goodwin's mother to direct any concerns to Principal DeBona, instead of Hegen, given his continued failure to address Miss Goodwin's complaints. At another point, distraught because of the school's ignorance regarding her daughter's rights, Miss Goodwin's mother sent a PowerPoint presentation teaching Jacqueline McHale – the designated PHS

11

administrator in charge of ensuring the school's compliance with Title IX—about that very federal law.

49.    Miss Doe now feels the responsibility to stand up for herself and other students who have lost the opportunity to learn – or may lose that opportunity in the future – because of PSD's pattern and practice of pushing harassment victims out of school. Miss Doe hopes that by bringing suit, she will help ensure future PDS students are not mistreated as she was.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Violation of Title IX, 20 U.S.C. § 1681(a) – Deliberate Indifference
(Defendant Pennridge School District)

50.    Miss Doe incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

51.    Title IX of the Education Amendments of 1972 provides, with certain exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

52.    PSD receives federal financial assistance pursuant to Title IX.

53.    Starting in April 2015 and through March 2016, PSD and its officials had actual knowledge of Miss Doe's report that D. and his friends consistently subjected Miss Doe to severe and pervasive sex-based harassment, including physical and verbal assaults.

54.    Superintendent Jacqueline Rattigan, Principal Gina DeBona, and Assistant Principal Scott Hegen all knew of the relationship abuse and subsequent sex-based harassment and had the authority to take corrective action. Yet they failed to take any steps to address the hostile educational environment created by the sex-based harassment.

55.     In spite of its knowledge of the severe and pervasive harassment Miss Doe reported, and its authority and control over the perpetrators, PSD and its officials failed to investigate the ongoing sex-based harassment, discipline the wrongdoers, or provide appropriate accommodations. PSD took no effective steps to address and to stop the sex-based harassment or to ensure that Miss Doe would continue to learn in a safe environment.

56.     Further, Hegen justified his decision not to investigate Miss Doe's claims – a decision which was repeatedly approved by the school principal and superintendent – on impermissible sex-based stereotypes that women who claim to be abused are "drama queens," "crazy," and merely vengeful scorned lovers, suggesting that PSD would have intervened had the victim been a boy.

57.     PSD was thus deliberately indifferent to Miss Doe's repeated reports of sex-based harassment, despite their authority and ability to address the continued harassment. Their response was clearly unreasonable in light of the known circumstances.

58.     As a result of PSD's deliberate indifference to the sex-based harassment, Miss Doe was, on the basis of her sex, excluded from participating in, denied the benefits of, and subjected to discrimination in, the PSD's education program in violation of Title IX.

59.     PSD and its officials' deliberate indifference subjected Miss Doe to sex-based harassment so severe, pervasive, and objectively offensive that she was denied equal access to educational opportunities, resources, and benefits. PSD's deliberate indifference caused Miss Doe to miss classes, lose interest in her educations, withdraw from participation in extracurricular activities, and spend her days in fear as she regularly encountered her harassers on campus.

60.     Ultimately, PSD and its officials directly caused Miss Doe to withdraw from PHS and attend Twilight, which provided inferior educational opportunities.

61.     As a direct and proximate result of PSD's deliberate indifference, Miss Doe has suffered emotional distress and psychological trauma for which she is entitled to be compensated.

**SECOND CLAIM FOR RELIEF**
Violation of the Right to Equal Protection, Brought Under 42 U.S.C. § 1983
Retaliation
(Defendants Pennridge School District)

62.     Miss Doe incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

63.     PSD receives federal financial assistance pursuant to Title IX.

64.     Miss Doe engaged in a protected activity when she repeatedly reported sex-based harassment to PSD officials.

65.     In response to these reports, PSD officials not only failed to protect Miss Doe, but retaliated against her by pushing her into Twilight, which provided clearly inferior educational opportunities.

66.     In doing so, PSD officials made clear that Miss Doe was required to leave PHS because she had reported the sex-based harassment. As Hegen told Miss Doe, he had "had enough" of hearing Miss Doe's "complaints."

67.     As a direct and proximate result of PSD's deliberate indifference, Miss Doe has suffered emotional distress and psychological trauma for which she is entitled to be compensated.

14

**THIRD CLAIM FOR RELIEF**
Violation of the Right to Equal Protection, Brought Under 42 U.S.C. § 1983
Failure to Train
(Defendants Pennridge School District, Rattigan, and DeBona)

68.     Miss Doe incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

69.     Defendants PSD, Superintendent Rattigan, and Principal DeBona were at all times relevant policymakers and administrators, acting under color of law, who had a duty to train, and failed to train, administrators, teachers, staff, employees, students, and parents concerning PSD and PHS policies on reporting and addressing on-campus and off-campus sex-based harassment of students like Miss Doe.

70.     PSD employees were insufficiently and inappropriately advised by Defendants PSD, Superintendent Rattigan, and Principal DeBona on Title IX and school policies regarding the investigation and response to reports of sex-based harassment, at both the district and school levels. This failure is evidenced by the following:

   a.  Principal DeBona and Assistant Principal Hegen incorrectly informed Miss Doe that PSD could not take disciplinary action against D. or his friends for their physical and verbal harassment;

   b.  Assistant Principal Hegen incorrectly informed Miss Doe that PSD could not investigate D.'s February 2016 attack because it had not been caught on video;

   c.  Hegen failed to investigate, as required by federal law and PSD's own school policy, the physical and verbal harassment reported by Miss Doe;

   d.  Hegen incorrectly justified his decision not to investigate Miss Doe's claims – a decision which was repeatedly approved by the school principal and superintendent

15

– on impermissible sex-based stereotypes that women who claim to be abused are "drama queens," "crazy," and merely vengeful scorned lovers, suggesting that PSD would have intervened had the victim been a boy;

e. Assistant Principal Hegen incorrectly informed Miss Goodwin, Miss Williams, and their mothers that PSD could not investigate alleged harassment the girls reported because it had occurred in part off-campus;

f. Another PSD official incorrectly informed Miss Goodwin's mother that PSD could not investigate the alleged rape she reported because it had occurred off-campus;

g. Miss Goodwin's mother had to teach Title IX Coordinator McHale about Title IX's requirements; and

h. Over the years that multiple students, including Miss Doe, Miss Williams, and Miss Goodwin, sought the school's help, PHS lacked the appropriate training to (i) recognize the need for an investigation into their reports, (ii) conduct proper investigations, or (iii) appropriately address their harassers' behavior.

71.     PSD, Superintendent Rattigan, and Principal DeBona had actual knowledge of their legal obligations, pursuant to Title IX and prior case law. They also had actual knowledge from past experience at PSD that not training staff to appropriately respond to or address off- and on-campus sex-based harassment results in violations of students' substantive due process rights under the Fourteenth Amendment, including, but not limited to, denying students equal access to PSD's educational resources and opportunities.

72.     Given PSD, Superintendent Rattigan, and Principal DeBona's actual knowledge of the need to train PSD staff to appropriately respond to and address reports of off- and on-

16

campus sex-based harassment in order to not violate students' constitutional rights, their failure to do so was unreasonable and amounted to deliberate indifference.

73.    Defendants' failure to adequately train its administrators and staff regarding how to appropriately respond and address claims of sex-based harassment at PSD and PHS specifically and directly caused PSD to violate Miss Doe's substantive due process rights under the Fourteenth Amendment including equal access to her educational institution's resources and opportunities, freedom from sex-based harassment in school, and right to bodily integrity.

74.    As a direct and proximate result of Defendants' inactions and violations of Plaintiff's clearly established constitutional rights, Miss Doe sustained and continues to sustain injuries, including emotional distress and psychological trauma, for which she is entitled to be compensated.

**FOURTH CLAIM FOR RELIEF**
Violation of the Right to Equal Protection, Brought Under 42 U.S.C. § 1983
Supervisory Liability
(Defendants Rattigan and DeBona)

75.    Miss Doe incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

76.    Defendant Superintendent Rattigan was at all relevant times an employee of Defendant PSD, acting under color of law, who had supervisory duties and responsibilities with respect to her subordinates, including Principal DeBona, Hegen, McHale, Henrysen, and Price.

77.    Defendant Superintendent Rattigan had actual knowledge and/or constructive knowledge, including knowledge she would have had if she used reasonable care or diligence, that her subordinates engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Plaintiff based on, *inter alia*, the following:

a.  Rattigan's receipt of multiple complaints from Miss Goodwin's mother about Hegen's mishandling of Miss Goodwin's reports of past and ongoing sex-based harassment;

b.  Rattigan's admission to Miss Goodwin's mother that Hegen was likely to mishandle reports of further harassment;

c.  Rattigan's inclusion on multiple emails over the course of Miss Goodwin's junior and senior years from Miss Goodwin's mother and PSD administrators discussing Miss Goodwin's continued struggles with harassment at PHS and her decision to withdraw;

d.  Miss Doe's mother's request for a meeting with Rattigan about her daughter's harassment and Hegen and Henrysen's inaction; and

e.  Price's report to Rattigan about his meeting with Miss Doe's mother concerning Miss Doe's harassment and Hegen and Henrysen's inaction.

78.    Defendant Principal DeBona was at all relevant times an employee of Defendant PSD, acting under color of law, who had supervisory duties and responsibilities with respect to her subordinates, including Hegen, McHale and Henrysen,.

79.    Defendant Principal DeBona had actual knowledge and/or constructive knowledge, including knowledge she would have had if she used reasonable care or diligence, that her subordinates engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Plaintiff based on, *inter alia*, the following:

a.  DeBona's receipt of multiple complaints from Miss Goodwin's mother about Hegen's mishandling of Miss Goodwin's reports of past and ongoing sex-based harassment;

b.   DeBona's inclusion on multiple emails over the course of Miss Goodwin's junior and senior years from Miss Goodwin's mother and PSD administrators discussing Miss Goodwin's continued struggles with harassment at PHS and her decision to withdraw;

c.   DeBona's knowledge that PHS officials were not adequately informed of PSD's ban of H. on campus after his graduation, failing to enforce that ban and permitting Miss Goodwin's harassers to also return to school after their graduation;

d.   Knowledge that Assistant Principal Hegen justified his decision not to investigate Miss Doe's claims  on impermissible sex-based stereotypes that women who claim to be abused are "drama queens," "crazy," and merely vengeful scorned lovers, suggesting that PSD would have intervened had the victim been a boy; and

e.   Hegen's regular reports to DeBona regarding Miss Doe's reports and his repeated decisions not to investigate.

80.    Defendants Superintendent Rattigan and Principal DeBona's responses to this actual and constructive knowledge were so inadequate as to show deliberate indifference to or tacit authorization of their subordinates' mistreatment of Miss Goodwin and Miss Doe.

81.    Defendants Superintendent Rattigan and Principal DeBona's responses to this actual and constructive knowledge exhibited reckless and/or callous indifference to Plaintiffs' federally protected rights.

82.    Defendants Superintendent Rattigan and Principal DeBona took no action to correct their subordinates' refusals to investigate or to take disciplinary action in response to Miss Goodwin's and Miss Doe's reports of sex-based harassment, their refusals to separate Miss Doe from her harassers, and other failures to ensure Miss Doe could remain at PHS.

83.     Further, Defendants Superintendent Rattigan and Principal DeBona maintained a policy, custom, and practice of (i) refusing to respond to reports of sex-based harassment, and (ii) forcing or encouraging victims to leave PHS, especially for an alternative and inferior school. They maintained this policy, custom, and practice, which their employees enacted, with deliberate indifference to the consequences.

84.     Defendants' failure to supervise and their policy, custom, and practice violated Miss Doe's and other students' substantive due process rights under the Fourteenth Amendment, including equal access to their educational institution's resources and opportunities, freedom from sex-based harassment in school, and right to bodily integrity.

85.     As a direct and proximate result of Defendants' actions, inactions, failure to supervise, policy, custom, practice, and violations of Miss Doe's clearly established constitutional rights, Miss Doe sustained and continues to sustain injuries, including emotional distress and psychological trauma, for which she is entitled to be compensated.

**FIFTH CLAIM FOR RELIEF**
Intentional Infliction of Emotional Distress
(Defendants Pennridge School District, Rattigan, and DeBona)

86.     Miss Doe incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

87.     At all times material and relevant hereto, Defendants PSD, Rattigan, and DeBona knew that they had statutory, common law, and assumed duties to provide a reasonably safe high school environment, including protecting Miss Doe from known individuals who had subjected each to severe, pervasive, and objectively offensive harassment.

88.     Defendants clearly knew that D. and his friends had subjected Miss Doe to persistent severe, pervasive, and objectively offensive harassment for most of the time that she

20

attended PHS. This information was presented to Defendants on numerous occasions as is described more fully in paragraphs 21 to 22, 27 to 34 and 38 to 40, among others.

89.     Defendants not only failed to take action to terminate and/or prohibit the persistent severe, pervasive, and objectively offensive harassment, but effectively encouraged such behavior by either not responding or responding inappropriately to Miss Doe's reports of sex-based harassment. Defendants' actions permitted D. and his friends to continue, and even ramp up, their campaign of harassment against Miss Doe.

90.     Defendants knew that these actions were depriving Miss Doe of equal access to educational resources and causing her to suffer from physical, verbal, emotional, and psychological harassment. As a result, Miss Doe was diagnosed with PTSD and effectively given no choice but to leave PHS and to attend an alternative school.

91.     The aforementioned conduct constitutes extreme and outrageous conduct, and exceeds the bounds of decency and tolerability in a civilized community.

92.     The extreme and outrageous conduct of Defendants PHS, Rattigan, and DeBona was intentional and/or reckless.

93.     As a direct and proximate result of Defendants' extreme and outrageous conduct, Miss Doe sustained and continues to sustain injuries, including that she was denied an equal opportunity to access their high school education and suffered emotional distress and psychological trauma, for which she is entitled to injunctive relief from PHS, Rattigan, and DeBona, in their official capacities, and monetary damages from Rattigan and DeBona, in their personal capacities.

## PRAYER FOR RELIEF

Miss Doe requests that this Court award her:

21

A. Compensatory  damages on Count I;

B. Compensatory damages on Count II;

C. Compensatory damages on Count III;

D. Compensatory damages on Count IV;

E. Compensatory Damages on Count V;

F. Punitive Damages on Count V;

G. Compensatory Damages on Count VI;

H. Punitive Damages on Count VI;

I. Attorney's fees;

J. Declaratory judgment that the Defendant's treatment of Miss Doe violated Title IX and the U.S. Constitution;

K. Injunctive relief ordering PSD to revise its policies, procedures, and practices so that it is in compliance with Title IX and the U.S. Constitution; and

L. Such other and further relief that is just and appropriate under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b), Plaintiff demands a trial by jury.

Dated:  August 9, 2017

Respectfully submitted,

BY:  _____

Courtney G. Saleski (Bar No. 90207)
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103-7300
Telephone: 215.656.2431
E-mail:        Courtney.Saleski@dlapiper.com

Matthew Graves
Katherine M. Ruffing
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
Telephone: 202-799-4469
E-mail:        Matthew.Graves@dlapiper.com
               Katie.Ruffing@dlapiper.com

Neena Chaudhry
Alexandra Brodsky
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, Suite 800
Washington, D.C. 20036
Telephone: 202-588-5180
Email:         nchaudhry@nwlc.org
               abrodsky@nwlc.org

23