# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNRIDGE SCHOOL | : | |
| DISTRICT, et al., | : | No. 17-3570 |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

**Timothy R. Rice**                                                                              **May 7, 2019**
**U.S. Magistrate Judge**

Plaintiff Jane Doe claims Defendants Pennridge School District ("PSD"), Superintendent Jacqueline Rattigan, and Principal Gina DeBona (collectively, "Pennridge Defendants") deprived her of equal access to an education, as required by 20 U.S.C. § 1681(a) ("Title IX") and 42 U.S.C. § 1983, by failing to adequately address her allegations of sexual harassment. <u>See</u> Compl. (doc. 1). Pennridge Defendants seek summary judgment regarding all five of Doe's claims: (1) a Title IX claim against PSD; (2) a § 1983 retaliation claim against PSD; (3) a § 1983 failure to train claim against all Pennridge Defendants; (4) a § 1983 supervisory liability claim against Rattigan and DeBona; and (5) an intentional infliction of emotional distress claim against all Pennridge Defendants. Def. Mem. (doc. 78) at 3. Doe moves for summary judgment on Claims 3 and 4, Pl. Mem. (doc. 81-1) at 2, opposes Defendants' motion on Claims 1 and 2, but does not contest dismissal of Claim 5, Pl. Resp. (doc. 88) at 5 n.2.

Defendants' unopposed motion is granted on Claim 5. Because material factual disputes exist on Claims 1 through 4, Doe's motion is denied, and Defendants' motion is granted in part and denied in part, as explained below.

## I.    Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material facts exists when "factual issues . . . may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). I must view the facts and draw inferences in the light most favorable to the nonmoving party. See Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013). Cross-motions must be considered "separately, drawing inferences against each movant in turn." Alford v. Hartford Life Ins. Co., No. 07-4527, 2008 WL 2329101, at *3 (E.D. Pa. June 3, 2008). I also may not make credibility determinations or weigh the evidence. Anderson, 477 U.S. at 255.

## II.    Undisputed Facts

In September 2014, Doe was a sophomore at Pennridge High School ("PHS"), PSOF ¶ 2,[1] and also attended a part-time technical school law enforcement program with another student, N., DSOF ¶¶ 11, 41. During that fall, N. became her boyfriend, and they dated through approximately April 2015. Id. ¶ 41. Doe alleges she was abused by N. during their relationship, and they broke up following an April 2015 violent incident in her bedroom that did not include sexual assault, but resulted in multiple bruises. Id. ¶¶ 43, 45. On June 15, 2015, Doe informed her 2014-15 school year guidance counselor, Lori D'Angelo, of her history with N. and complained that he continued to harass her and "push[] her" during school hours. Id. ¶ 53; Def.

---

[1]    These facts come from Plaintiff's Statement of Undisputed Facts (doc. 81-3) ("PSOF") and Defendant's response (doc. 86), as well as Defendant's Statement of Undisputed Facts (doc. 79) ("DSOF") and Plaintiff's response (doc. 88-1). Although I cite only PSOF or DSOF, each reference incorporates the opposing party's corresponding response.

Ex. 17.[2]  D'Angelo emailed N.'s assistant principal, David Laboski, to ask N. to have no further contact with Doe.  DSOF ¶¶ 54-55.

At the start of her junior year, on September 4, 2015, Doe and her father met with Doe's assistant principal, Scott Hegen, again alleged N. had been abusive during the relationship, and expressed concern that the abuse "may continue."  Pl. Ex. 10.  Doe asked "to be sent to an Alt. School or to Tech all day."[3]  Id.  Instead, PHS added Doe to "the girls anxiety group" as a "first step."  Id.  At that meeting, Doe reported that N. talked about her, called her a "whore" and "slut," and threatened to kill himself if she would not get back together with him.  Id.; Doe Dep. at 85.  She also mentioned being harassed by another student, A., on behalf of N. over the summer.  Pl. Ex. 10.  On September 15, 2015, Doe reported to her teacher, Brooke Roush, that she was anxious in school, at least in part because she had "to face the boy who assaulted her" the prior year.  Def. Ex. 28.  On September 16, 2015, Doe met with her junior year guidance counselor, Erik Henrysen, and explained that she was uneasy around N. and was sharing a class with N.'s new girlfriend, A9.  Def. Ex. 31.  She again requested placement in "all day tech."  Id.

On October 1, 2015, a certified nurse practitioner from Doe's primary care practice opined that Doe's anxiety justified placement in all-day technical school.  DSOF ¶ 75.  On October 2, 2015, Doe again requested full-time placement in the technical program, and assistant principal Hegen wrote in an email to his colleagues that, "[r]ecommending her to the IU[4] is nice

---

[2]      Defendants' exhibits, numbered one through 119, were submitted in support of Defendants' Statement of Undisputed Facts (doc. 79).  Plaintiff's exhibits one through 38 were submitted in support of her Motion for Summary Judgment (doc. 81), and exhibits 39 through 75 were submitted in support of her Memorandum in Opposition to Defendants' Motion for Summary Judgment, Pl. Resp. (doc. 88).

[3]      This referred to the technical school that Doe attended part-time.

[4]      This is also a reference to the technical school program.

and all . . . . but . . . NO." Def. Ex. 33. Doe and/or her family continued to request that PSD place her full-time in the technical program on October 14, 2015, Def. Ex. 34, and November 9, 2015, Def. Ex. 60. On November 13, 2015, Doe gave PSD a note from her treating therapist, a licensed clinical social worker, who also opined the full-time technical program would be a more appropriate placement for Doe to accommodate her anxiety. DSOF ¶ 78.

On November 24, 2015, Doe reported to Hegen that N. was stalking her. Pl. Ex. 15. She submitted a written PSD incident report stating that N. was "torment[ing]" her, which was witnessed by "everyone who sits with [her] in the morning." Id. She reported that "N. continuously shows up wherever I am." Id. In response to the incident form's question about how she wished she had handled the incident differently, Doe wrote that she wished she had "yelled since the school hasn't done anything to help." Id. She explained that "Mr. Hegen doesn't see this as a huge concern." Id.

That same day, PSD granted Doe a "permission to evaluate," which allowed her to be evaluated for the full-time technical school program. DSOF ¶ 86. On December 7, 2015, Doe met with Hegen and reported that N.'s cousin, T2, was threatening to hit her, and she was still being "follow[ed]" by N. Def. Ex. 66. Hegen noted Doe had not reported the physical threat directly to her teacher. Id. On December 8, 2015, Hegen contacted Doe's parents to discuss how best to support Doe at PHS. Def. Ex. 41. On December 9, 2015, Doe submitted another incident report regarding T2. Def. Ex. 66.

On December 15, 2015, Ross Owens, a PSD school psychologist, informed his colleagues he did not believe Doe would qualify for full-time technical school based on her grades and attendance records. Def. Ex. 69. Hegen explained to Owens and Henrysen that Doe nevertheless needed to be evaluated because PSD had "to go through the process." Def. Ex. 39.

On December 22, 2015, Doe and N. had a confrontation in the hallway and submitted conflicting written accounts of the event.  Def. Exs. 42-45.  Hegen contacted N.'s parents to let them know that, although N. was "not in trouble," further events "could be considered harassment."  Def. Ex. 47.  Doe requested alternative placement again as part of her report of that incident.  Def. Ex. 42.

Doe renewed her request for alternative placement on January 14, 2016.  Def. Ex. 75.  On February 9, 2016, Hegen opined that Doe was acting out in an effort to get kicked out of PHS.  Def. Ex. 73.  On March 4, 2016, Doe asked to attend cyber school.  Def. Ex. 75.  On March 14, 2016, Owens determined Doe did not qualify for educational services, and therefore could not be placed full-time in the technical program.  Def. Ex. 77.

On April 12, 2016, during the spring of her junior year, Doe transferred to the Twilight program.  PSOF ¶ 41.  This program consisted of four to six hours per week of in-class time held two to three evenings per week, during which students completed printed coursework but did not receive teacher-led instruction.  Id. ¶¶ 43-44.  Doe completed all Twilight course work for her junior and senior years of high school by May 12, 2016.  DSOF ¶ 163.  Doe began, but did not complete, a career internship program during her senior year.  Id. ¶ 165; Def. Ex. 14.  Doe did not attend PHS during her senior year, but graduated on June 8, 2017.  DSOF ¶ 178.

During the applicable time period, PSD's Policy No. 248 addressed its Title IX procedure related to sexual harassment.  Id. ¶ 185.  Policy No. 248 includes, inter alia, the following provisions: "complaints of harassment shall be investigated promptly, and corrective action taken when allegations are substantiated."  Id. ¶ 184; Pl. Ex. 7.  It notes that "[n]o reprisals nor retaliation shall occur as a result of good faith charges of harassment," and defines "harassment" as "verbal, written, graphic or physical conduct relating to an individual's race, color, national

origin/ethnicity, sex, age, disability, sexual orientation or religion" only if that conduct has certain effects or "[i]s sufficiently severe, persistent or pervasive that it affects an individual's ability to participate in or benefit from an educational program or activity or creates an intimidating, threatening or abusive educational environment." Pl. Ex. 7. The policy separately defines "sexual harassment" as "unwelcome sexual advances; requests for sexual favors; and other inappropriate verbal, written, graphic or physical conduct of a sexual nature when" one of a series of other criteria are met, including that "[s]uch conduct is sufficiently severe, persistent or pervasive that it has the purpose or effect of substantially interfering with the student's school performance or creating an intimidating, hostile or offensive educational environment." Id.

The policy also specifies the four steps of the complaint procedure, which include that, "[u]pon receiving a complaint of unlawful harassment, the building principal shall immediately notify the Compliance Officer." Id. It directs "[t]he Compliance Officer [to] authorize the building principal to investigate the complaint," and "[t]he building principal [to] prepare and submit a written report to the Compliance Officer within fifteen (15) days." Id. Finally, the policy requires district action as well. "If the investigation results in a finding that the complaint is factual and constitutes a violation of this policy, the district shall take prompt, corrective action to ensure that such conduct ceases and will not recur. . . . If it is concluded that a student has knowingly made a false complaint under this policy, such student shall be subject to disciplinary action." Id.

PHS's Student Handbook states that, "[o]nce a report of discrimination or harassment has been made, an investigation will be conducted." Pl. Ex. 58. An unwritten PSD policy gives administrators discretion to categorize complaints as "harassment" or "peer conflict," which is

not covered by PSD's harassment policy. Pl. Ex. 6 at 226. Another unwritten PSD policy authorizes assistant principals to investigate student-against-student harassment. Pl. Ex. 5 at 249.

Defendant Rattigan was the superintendent of PSD during the 2015-16 and 2016-17 school years, and was responsible for developing reasonable and necessary rules and regulations to implement school board policies. DSOF ¶ 4. Defendant DeBona was the principal of PHS during the same period, and was responsible for investigating complaints of harassment, a responsibility she sometimes delegated to her assistant principals. PSOF ¶ 8. Jacqui McHale was the PHS compliance officer, or Title IX coordinator, during the same period. Id. ¶ 6.

PSD staff received in-person powerpoint presentations that included information about Title IX harassment in September or October 2013 and August 2014. DSOF ¶¶ 186-87. Beginning in July 2015, Hegen attended quarterly assistant principal meetings run by Troy Price, director of PSD administration, who reviewed district policies. Id. ¶ 205. Price also discussed PSD policies at monthly principal meetings. Id. ¶ 244.

As of August 2015, however, Hegen could not identify the PSD Title IX coordinator. PSOF ¶ 338. Since the fall of 2015, PSD staff have completed online training through the global compliance network, which includes issues related to Title IX harassment. DSOF ¶ 190. Plaintiff's Title IX expert, Dr. William A. Howe, reviewed the training materials and concluded Pennridge's training of employees and students was inadequate. Pl. Ex. 59 at 2.

### III.     Claims 1 and 2: Title IX Sexual Harassment and § 1983 Retaliation

Because only Pennridge Defendants have moved for summary judgment on the first two claims, I must review the motion while viewing the facts in the light most favorable to Doe. Burton, 707 F.3d at 425.

1. <u>The Facts in the Light Most Favorable to Doe</u>

In addition to the undisputed facts above, Doe testified that, during her nearly five-month relationship with N., he "used to shove [her] and hold [her] wrists." Doe Dep. at 41. This occurred both inside and outside of school. <u>Id.</u> According to Doe, the relationship was both physically and emotionally abusive. He called her a "whore" and a "bitch," insulted her appearance, and tried to manipulate her into dropping out of the law enforcement program, arguing it was not safe for females to be police officers. <u>Id.</u> at 50. They broke up after an incident in her bedroom in which N. "shoved [Doe] down and bit [her] and held [her] wrists down and was yelling at" her. <u>Id.</u> at 37. Pennridge Defendants suggest that this incident was not serious because Doe and her family never called the police. Def. Mem. at 4. Doe testified that her father had wanted to go to the police, but was convinced by Doe's grandmother to handle the incident directly with N.'s family instead. Doe Dep. at 44-46.

Sometime after the physical altercation that ended her relationship with N., Doe showed pictures of her bruising to Hegen and Henrysen. <u>Id.</u> at 47. She also claims she discussed the abusive relationship with two teacher's aides, <u>id.</u> at 169, 171, and that administrators promised that during her junior year, N.'s classes would be scheduled on the other side of the school from hers, <u>id.</u> at 77. She testified she was promised an escort to travel with her between classes, <u>id.</u> at 103, but was never escorted or even given access to a staff escort, <u>id.</u> at 108.

After the break-up, Doe received disappearing Snapchat messages, first from N. and then, after she blocked him, from unidentified people who claimed to be friends of his. <u>Id.</u> at 53-54. The messages insulted her appearance, called her "bitch" and "whore," and threatened that N. would kill himself if Doe did not get back together with him. <u>Id.</u> at 53-54, 193-94. Doe received 10-15 messages like these over the summer between her sophomore and junior years of high

school.  Id. at 55.  The messages from N.'s friends warned her that it would be Doe's fault if N. killed himself.  Id. at 73.  They continued until after the December 2015 incident in the middle of her junior year.[5]  Id. at 86.  In addition, during the first half of her junior year, Doe would see N. in the morning while eating her breakfast and congregating with friends, and in the hallways.  Id. at 71.  He would make comments under his breath and call her a "bitch" as she walked by.  Id. He would "show up" outside her classes daily, and she would see his friends laugh at whatever comments he was making about her.  Id. at 74, 76.

Doe contends she visited Hegen regularly during the fall of 2015 to complain about N. "show[ing] up wherever" she was, i.e., stalking her.[6]  Pl. Ex. 15.  The anonymous, disappearing Snapchat messages included gender-based slurs and resulted in Doe feeling uncomfortable continuing in the law enforcement program.  Doe Dep. at 60, 67.  She stated Hegen called her "crazy," and a "drama queen" after her repeated complaints during her junior year, id. at 102,

---

[5]     Defendants incorrectly summarize Doe's testimony when they state she "said that N. never touched her or called her vulgar names after she broke-up with him."  Def. Resp. (doc. 87) at 13.  Although she acknowledged there was no physical contact after their break-up, she testified that N. threatened to kill himself if she would not resume their relationship, and regularly called her a "bitch" whenever she would pass him in the halls.  Doe Dep. at 53, 71. Defendants also misleadingly quote her testimony by stating she "admitted that none of N.'s friends said anything to her in the classroom or at school that made her feel uncomfortable and she could not identify even one person who made her uncomfortable."  Def. Resp. at 13. Although Doe was unable to remember the names of N.'s friends and testified that none of them spoke to her directly, she testified that they repeatedly contacted her on social media to tell her that it would be her fault if N. committed suicide, and laughed when N. regularly insulted her in the school hallways.  Doe Dep. at 54, 72-76.

[6]     Defendants note that Doe reported multiple instances of peer conflict with female students as well.  See, e.g., Def. Ex. 66.  Doe does not dispute that those reports and/or conflicts took place, but disputes their significance to her claim of sexual harassment by N.  PSODF ¶ 87. Viewed in the light most favorable to Doe, a jury could conclude those instances of peer conflict are irrelevant to her sexual harassment claim involving N.

and dismissed her allegations without investigation, id. at 77-78. She alleges that at one point Hegen barred her from speaking with her guidance counselor, Henrysen. Id. at 105.

Although whether Doe complained to Hegen every day during the fall of 2015 is disputed, documentation of Doe's complaints regarding N.'s harassment during meetings with administrators are dated September 4, 2015 (Def. Ex. 29), September 16, 2015 (Def. Ex. 31), October 2, 2015 (Def. Ex. 33), October 14, 2015 (Def. Ex. 34), November 24, 2015 (Def. Ex. 37), and December 22, 2015 (Def. Ex. 42). Independent of those six written complaints or documented meetings, PSD administrators concede that Doe made in-person verbal complaints at least once per week for the first six to eight weeks of the 2015-16 school year. PSOF ¶ 51 (citing Hegen Dep. at 431-32). Doe further contends that she continued to complain of harassment by N. after the December 2015 Incident. PSOF ¶ 103.

2. Claim 1: Title IX Sexual Harrassment

To prove Title IX liability, Doe must show: (1) PSD received federal funds; (2) she was sexually harassed; (3) PSD had "substantial control" over both the harasser(s) and the context of the harassment; (4) PSD had "actual knowledge" of the harassment; (5) PSD was "deliberately indifferent" to the harassment; and (6) the harassment deprived her of access to educational opportunities or benefits. Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 650 (1999).

If credited, Doe's evidence is sufficient to raise disputed issues of material fact on whether: (1) Doe was sexually harassed; (2) PSD had actual knowledge of the harassment; (3) PSD was deliberately indifferent to the harassment; and (4) the harassment caused a deprivation of educational opportunities or benefits.[7] Davis, 526 U.S. at 650.

---

[7] PSD does not dispute that it received federal funds or had "substantial control." See generally, DSOF.

The parties agree Pennridge Defendants had no control over the assault that occurred in Doe's bedroom and that PSD had no "actual knowledge" of the abuse before June 5, 2015. Pl. Resp. (doc. 93) at 29. The disputes center on PSD's actions once it learned of Doe's allegations of prior abuse and ensuing harassment at school. Pennridge Defendants claim Doe wanted to leave PHS because she did not get along with other students, not because she was afraid of N. Def. Mem. at 11. They contend Doe had "another agenda for wanting to transfer" schools, revealed during the June 2015 meeting. Id. at 5. Doe, however, disputes this, and her father, who was at the June 2015 meeting and supposedly told the school counselor about Doe's alternative motivation, does not recall saying it. K.F. Dep. at 105. Doe maintains she felt compelled to leave PHS when administrators refused to provide her a safe learning environment. See Def. Ex. 42. This is a jury issue that must be resolved at trial, i.e., whether Doe actually felt the harassment she endured created a hostile educational environment. Andrews v. City of Philadelphia, 895 F.2d 1469, 1482-83 (3d Cir. 1990).

A. Whether the Alleged Harassment was Sexual

As a threshold matter, I must determine whether Doe has proffered sufficient evidence which, if credited, would support a jury decision that she was sexually harassed as a student at PHS. This is a close question, especially in the context of a high school dating relationship in which no sexual assault occurred. Like Title VII sexual harassment claims, Title IX hostile educational environment claims must be rooted in intentional sex discrimination. Andrews, 895 F.2d at 1482 n.3. Although "[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language . . . should be recognized as a matter of course," harassment that is "not sexual by [its] very nature" requires a "more intensive factual analysis." Id. For example, repeated solicitations and any associated

"stalking" are considered sexual harassment.  See Jones v. Indiana Area Sch. Dist., 397 F. Supp. 2d 628, 644-46 (W.D. Pa. 2005) (denying summary judgment on Title IX claim when mentally impaired student repeatedly asked female student to date him, waited for her by her locker and after school, and gave her gifts and notes).  Whether a course of harassment that includes gender non-specific threats and/or taunts is "because of" gender, however, must be determined based on "the sum total of abuse over time."  Hall v. Guardsmark, LLC, No. 11-115, 2012 WL 1564623, at *9 (W.D. Pa. May 3, 2012) (citing Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir.1999)).

In 2010, the Department of Education alerted school districts that harassment with sexually charged epithets by an ex-boyfriend constitutes sexual harassment for Title IX purposes. Dep't of Educ. OCR, "Dear Colleague" Letter at 6-7 (Oct. 26, 2010).  Harassment by a former paramour is considered sexual harassment even when some of the harassing conduct appears gender neutral.  See Krebs v. New Kensington-Arnold Sch. Dist., No. 16-610, 2016 WL 6820402, at *3-4 (W.D. Pa. Nov. 17, 2016) (course of harassment by a large group of peers which included calling plaintiff fat and ugly, being threatened and attacked by female peers, being told to kill herself, and being targeted by ex-boyfriend with terms like "whore" and "slut" constituted sexual harassment for purposes of Title IX claim); cf. C.S. v. Southern Columbia Sch. Dist., No. 4:12-CV-1013, 2013 WL 2371413, at *9 (M.D. Pa. May 21, 2013) ("in light of the sexual assault, we cannot say as a matter of law that those contacts and threats from the perpetrators' friends do not amount to sexual harassment").

PSD argues that Doe has failed to allege conduct constituting sexual harassment.  Def. Mem. at 17.  It contends that neither N. nor his friends ever assaulted or threatened Doe after her

June 2015 report.  Id. at 20-21.  PSD notes that even the alleged physical abuse by N. at the end

of N. and Doe's relationship was not sexual in nature.  Id. at 18.

The harassment Doe claims she reported to PSD beginning in June 2015 qualified as

sexual harassment for Title IX purposes.  N.'s demand that Doe get back together with him or be

responsible for his death is recognized as sexual harassment "as a matter of course."  Andrews,

895 F.2d at 1482 n.3 (acknowledging "the intent to discriminate on the basis of sex in cases

involving sexual propositions").  The subsequent threats by N. and his friends that it would be

Doe's "fault" if N. killed himself, although perhaps not sexual in isolation, continued that same

line of sexual harassment.  See C.S., 2013 WL 2371413, at *9.  According to Doe, she dropped

out of the law enforcement program because of the anxiety caused by this harassment.  Doe Dep.

at 60.  Given her testimony and documented complaints of stalking and gender-based insults like

"bitch" and "whore," Doe has produced sufficient evidence for a reasonable jury to find she

complained of sexual harassment.  See Krebs, 2016 WL 6820402, at *3-4.

B.  Whether the Alleged Harassment was Severe or Pervasive

To constitute actionable sexual harassment, the offending behavior must be sufficiently

"severe, pervasive, or objectively offensive" to create a hostile educational environment.  Doe by

& through Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 533 n.99 (3d Cir. 2018) (Title IX

sexual harassment cases in the educational context should be guided by standards developed in

Title VII workplace sexual harassment cases).  To determine whether alleged harassment is

"severe or pervasive," the "overall scenario" must be considered, not isolated incidents.

Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 276 (3d Cir. 2001); but see

Castleberry v. STI Group, 863 F.3d 259, 264-65 (3d Cir. 2017) (a "single isolated incident" of

sufficient severity could "create a hostile work environment").  Further, the harassment must

have been both subjectively offensive to the plaintiff and objectively offensive. Andrews, 895 F.2d at 1482-83; see also Grooms v. City of Philadelphia, No. 17-2696, 2018 WL 4698856, at *6 (E.D. Pa. Sept. 28, 2018) (denying summary judgment because a reasonable jury could find three comments made to solicit sexual interaction in circumstances that reasonably led plaintiff to feel physically threatened were sufficient to establish a hostile work environment).

Sexual harassment may be proven with evidence of physical abuse, Krebs, 2016 WL 6820402, at *2, threatening behavior, Jones, 397 F. Supp. 2d at 634-37, 644-46, and even mere presence if the prior harassment has been sufficiently severe, Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 717 (3d Cir. 1997) (being forced to work in proximity to former harassers is a "significant factor weighing in favor" of hostile work environment claim); see also Martin v. Howard Univ., No. 99-1175, 1999 WL 1295339, at *5 (D.D.C. Dec. 16, 1999) (denying summary judgment motion in sexual harassment claim because whether eight contacts with alleged "stalker" constituted sufficiently severe and pervasive activity was a jury question).

PSD contends that, even if the harassment Doe alleges is considered sexual, it was not severe, pervasive, or objectively offensive enough to create an actionable hostile environment under Title IX. Def. Mem. at 17. Viewing the facts in the light most favorable to Doe, however, she endured a campaign of harassment organized by an abusive former boyfriend that consisted of social media threats, stalking, taunting, and ultimately a physical threat in school. Doe Dep. at 53-55, 71-76, 193-94; Def. Exs. 29, 31, 33, 34, 37, 42. Especially given the frequency with which Doe alleges this harassment took place, a reasonable jury could find it meets the objective "severe or pervasive" standard for sexual harassment. Grooms, 2018 WL 4698846, at *6.

### C. Whether PSD was Deliberately Indifferent

To establish that PSD's response to her allegations evinced "deliberate indifference," Doe

must show its actions were "clearly unreasonable."  Davis, 526 U.S. at 648.  Failing to undertake new measures when an initial approach has failed can be sufficient to establish deliberate indifference, S.K. v. N. Allegheny Sch. Dist., 168 F. Supp. 3d 786, 802 (W.D. Pa. 2016), but it requires "that the official disregard a known or obvious consequence of his action or inaction." Bernard v. E. Stroudsburg Univ., No. 3:09-525, 2014 WL 4093069, at *3 (M.D. Pa. October 18, 2014).

To support her claim that PSD was "deliberately indifferent" to her injuries, Doe cites testimony from DeBona and McHale that PSD maintained a different Title IX policy in practice than it did on paper.  See Pl. Ex. 5 at 249 (McHale testimony) ("Q: is there any other policy that you're aware of that gives administrators authority to investigate complaints of sexual harassment?  A: I think it would be unwritten policy that they had the authority in their position as a high school administrator to investigate a student complaint.").

Doe contends PSD's policy was to refer sexual harassment allegations to the Title IX Coordinator only after they had been investigated and deemed substantiated.  Pl. Ex. 5 at 249. DeBona testified:

> A: If we do an investigation and through -- at the conclusion of the investigation we determine there's clear and pervasive harassment, we will include Jacqui McHale.
>
> Q: So just so I understand, that means that you don't always inform McHale when there's an allegation of harassment, but you do inform her if there is an investigation that substantiates harassment; is that right?
>
> A:  We will involve her when it is harassment as it would pertain to sex and gender under Title IX. We would not include her if it was peer conflict and we put safety plans in place to support the students.
>
> Q: Right.  So – I'm just trying to understand sort of the timeline here.  So we have here a student's allegation that she is constantly harassed by another student.  Was the decision not to inform McHale of the allegation because you only inform her once something's been substantiated?

A: We have a student who alleges that she was constantly harassed. We don't have statements or we don't have documentation to support the constantly harassed. We have a peer conflict that we addressed along the way when Doe would bring the incidents to Mr. Hegen's attention and they would be addressed and plans put in place.

Q: So – ok. I have a couple of questions about this. Again, I know it sounds like I'm really splitting hairs here, but I want to make sure I have a clear answer to my question. You do not report all allegations of harassment to Jacqui McHale; is that correct?

A: We do not report peer conflict to Jacqui McHale. We will report cases of harassment based on sex, gender, origin, ethnicity to Jacqui McHale.

. . .

Q: I'll repeat the same question that I've asked multiple times. Are all allegations of harassment reported to Jacqui McHale?

A: All allegations of harassment based on sex, gender, and ethnicity, et cetera, is reported to Jacqui McHale.

Q: So why was Doe's allegation of constant harassment not reported to her?

A: Because we didn't see this as harassment based on sex, gender. We saw this as a peer conflict, of which we were putting safety plans in place to support Doe and the other student, both of whom have rights.

Pl. Ex. 6 at 226-33.

A reasonable jury could conclude that PSD maintained an unwritten policy requiring any allegations of sexual harassment to be investigated and substantiated before they were referred to the Title IX coordinator in violation of PSD Policy No. 248. It could also find that Hegen ignored Doe's repeated complaints based on this policy.

Further, Pennridge Defendants had reason to be aware that the behavior Doe was describing constituted sexual harassment. The 2010 Department of Education guidance described the classic example of "sexual harassment" as a female student who, after a break up, finds herself responding to rumors about her sexual behavior, being "routinely call[ed] . . . sexually charged names," and receiving "threatening text messages and emails." 10/2010 Dear

Colleague Letter at 6.  It also described an appropriate response, which includes "conduct[ing] a thorough investigation," "tak[ing] interim measures to separate the student from the accused harassers," and "more widely distributing the contact information for the district's Title IX coordinator." Id. at 7.  In contrast, a jury could find that when Doe complained to Hegen that she was being stalked daily by her abusive ex-boyfriend, he called her a "drama queen" and failed to document her complaints.[8]  Doe Dep. at 102.

Only the December 2015 incident triggered an investigation, which consisted of Hegen requiring four of five identified student witnesses to complete incident forms.  Def. Exs. 42-45.  According to Doe, during the December 2015 incident, N. raised his fists to his chest in a threatening gesture.  Def. Ex. 42.  It is unclear whether Defendants contest that the gesture took place, or merely contest that it was threatening.  Def. Mem. at 22 ("Clearly, Doe's demonstration of N.'s actions are not threatening gestures.").  Regardless, the disputed facts preclude summary judgment.  A reasonable jury could believe Doe that the gesture took place, and find raising his fists to chest level threatening.  See Def. Ex. 46.  This is especially so if it finds N. raised his fists at a former girlfriend he had physically abused.  C.S., 2013 WL 2371413, at *9.

A reasonable jury could believe Hegen's treatment of the December 2015 incident and Doe's earlier complaints was "clearly unreasonable" based on his failure to take into account: (1) Doe's prior report of a sexual relationship and physical abuse in her bedroom by N.; (2) the

---

[8]  Doe has also produced evidence that suggests PSD should have been on notice that N. posed a potential threat to female students.  N.'s disciplinary files reveal he had previously been accused of sex-based harassment by other students in October 2013 and April 2014.  PSOF ¶¶ 305-06.  He had allegedly sent inappropriately sexual texts to a 13-year-old in October 2013.  Pl. Ex. 17.  His poor behavior in the technical school, which included theft, lack of preparation, horseplay, excessive talking, and inappropriate comments, also apparently involved sexual comments.  Pl. Ex. 18.  It resulted in another female student leaving the program because he "crosse[d] a line and just [didn't] know when to stop." Id.

administration's prior request that N. stay away from Doe; (3) N.'s history of sex-based harassment of other students; and (4) Doe's multiple prior and subsequent complaints, during the 2015-16 school year, of harassment by N.'s friends, stalking, and sexual insults by N. See Krebs, 2016 WL 6820402, at *4; C.S., 2013 WL 2371413, at *1; Andrews, 895 F.2d at 1485 ("the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment"), superseded in part by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072; see also Vance v. Spencer Cty. Pub. Sch. Dist., 231 F.3d 253, 259 (6th Cir. 2000) (alleged harassment was sufficient to state a Title IX claim when the student's complaints "curiously warranted . . . completing her studies at home, but not an investigation"); cf. Konstantopoulos, 112 F.3d at 716 (finding formerly hostile environment was remedied when, upon employee's return to work after period of leave, co-workers had been warned against harassment; new procedures for remedying improper conduct had been implemented; supervisor made frequent, unannounced visits to the area; and employee made no further complaints).

Title IX regulations and PSD's policy both require complaints of sexual harassment to be investigated, with notice to the Title IX coordinator. 34 C.F.R. § 106.8; Policy No. 248, Step 2. Viewed in the light most favorable to Doe, a reasonable jury could find PSD's unwritten policies were clearly unreasonable, and the district was deliberately indifferent to Doe's repeated complaints of sexual harassment when it followed those unwritten policies instead of the Title IX guidance, regulations, and official PSD policy regarding categorization of behavior as sexual harassment, investigation of sexual harassment allegations, and involvement of the Title IX coordinator once sexual harassment has been alleged.

Finally, a reasonable jury could conclude that, because of PSD's failure to address the

ongoing harassment and repeated denials of her request for alternative placement at the technical school, Doe was forced to accept the only alternative placement offered to her: the Twilight program. PSOF ¶ 41; Def. Exs. 75, 77. It could also find this program was inferior to those at PHS and the technical school because Doe finished the coursework for her junior and senior years of high school in one month. PSOF ¶¶ 43-44; DSOF ¶ 163.

Defendants' motion for summary judgment is denied as to Count 1. Doe has produced sufficient evidence from which a reasonable jury could find that: (1) Doe endured a physically and emotionally abusive relationship with N.; (2) Doe informed PSD officials about abuse within that relationship sometime after the relationship was terminated; (3) after their relationship ended, N. and his friends intentionally harassed Doe on social media; (4) N. was instructed to stay away from Doe; (5) after being instructed to stay away from Doe, N. intentionally intimidated Doe by stalking and taunting her at PHS; (6) Doe repeatedly informed authorities that N. and his friends were intentionally harassing and stalking her; (7) PSD failed to document all of Doe's complaints about N.; (8) PSD authorities failed to investigate most of Doe's complaints about N.; (9) PSD failed to follow its own Title IX policy when it did investigate one of Doe's complaints about N.; (10) PSD concluded, without adequate investigation, that Doe's December 2015 complaint about N. could not be verified; (11) PSD failed to take corrective action reasonably designed to allow Doe to safely continue her education at PHS; and (12) PSD failed to provide Doe an equivalent education in an alternative environment.

### 3. Claim 2: § 1983 Retaliation

To establish a § 1983 retaliation claim, Doe must first set forth a prima face case of retaliation by demonstrating: (1) she complained of sexual harassment; (2) PSD knew she had complained of sexual harassment; and (3) PSD took adverse action against her (4) because of her

complaints.  Yan Yan v. Penn State Univ., 529 F. App'x 167, 171 (3d Cir. 2013).  Whether an action is "adverse" is an objective assessment of whether it produced "injury or harm." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 67 (2006).

Viewed in the light most favorable to Doe, evidence establishes that she began requesting full-time placement outside PHS in June 2015, and specifically at the technical vocational school in September 2015.  Pl. Ex. 10.  She submitted to PHS recommendations from two medical professionals for placement at the technical school in fall 2015 and she or a family member requested this placement at least five more times before PSD agreed to evaluate her eligibility on November 24, 2015.  DSOF ¶ 74; Def. Exs. 34, 60; Pl. Ex. 15.  Before agreeing to evaluate her, but after receiving the recommendation from Doe's primary care provider, Hegen wrote an email informing his colleagues of his opposition to Doe's requests.  Def. Ex. 33.  When he requested that Owens evaluate Doe's eligibility, Hegen explained the evaluation needed to be done simply "to go through the process."  Pl. Ex. 53.  Before he conducted any evaluation of her anxiety or post-traumatic stress disorder ("PTSD"), Owens wrote to Hegen that, based on Doe's grades and attendance record, "she most likely will not meet one of the criteria to receive special education services."  Pl. Ex. 54.  According to Doe's expert, Owens failed to appropriately assess Doe for special educational services based on her PTSD and anxiety disorder.  Pl. Ex. 48.

A reasonable jury could determine that PSD pre-judged Doe ineligible for special education services before evaluating her, and that they did so because they were frustrated with Doe's ongoing complaints.  See, e.g., Pl. Ex. 50 ("she is just fixated on not being here").  Because there are material facts in dispute which a reasonable jury could resolve in Doe's favor regarding her claims for Title IX sexual harassment and § 1983 retaliation, Defendant's motion for summary judgment on Count 2 is denied.  See Farrell v. Planters Lifesavers Co., 206 F.3d

271, 284 (3d Cir. 2000) (Plaintiff may rely on "a broad array" of circumstantial evidence to establish retaliatory animus); see also Dep't of Educ. OCR, "Q&A on Title IX and Sexual Violence" (April 29, 2014) at 7 ("[a] student who has not been previously determined to have a disability may, as a result of experiencing sexual violence, develop a mental health-related disability that could cause the student to need special education and related services").

## IV.  Claims 3 and 4: § 1983 Failure to Train and Supervisory Liability

To establish a hostile environment equal protection claim, Doe must prove all the elements of her Title IX claim and that "the harassment was the result of municipal custom, policy, or practice." Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257-58 (2009) (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694 (1978)).

### 1.  Claim 3: Failure to Train against PSD

To establish a §1983 failure to train claim, Doe must prove there was: (1) an "identified deficiency" in the training (2) caused by a deliberate indifference to her rights (3) that "actually caused" the constitutional violation. Thomas v. Cumberland Cty., 749 F.3d 217, 222 (3d Cir. 2014); see also Kline ex rel. Arndt v. Mansfield, 255 F. App'x 624, 629 (3d Cir. 2007) ("Failure to train can be the basis for Hamburg's liability if the failure to train reflects a deliberate or conscious choice by Hamburg").

The cross-motions for summary judgment are denied.  Defendants assert that the undisputed facts show their training was adequate.  Def. Mem. at 38-39.  Doe has produced an expert who disagrees.  Pl. Ex. 59 at 2.  Moreover, PSD cannot dispute that, as of August 2015, Hegen was unable to identify the Title IX coordinator, PSOF ¶ 338.  Doe asserts the training was inadequate as a matter of law and caused her damages, but since the material factual disputes described above preclude finding as a matter of law that she suffered statutory or constitutional

damage, she cannot be awarded summary judgment.  Banks v. Gallagher, 686 F. Supp. 2d 499,

511 (M.D. Pa. 2009) ("[f]or a failure to train claim . . . the first element is proof that an

underlying constitutional violation has occurred . . . [and because ] . . . the evidence provided . . .

could only possibly demonstrate a violation . . . summary judgment is inappropriate").  Further,

there are material factual disputes as to the content of the training, apart from the documentation

of the training, that must be resolved by a jury.  See DSOF ¶¶ 186-284.

### A.  Official Capacity Failure to Train Claim against Individual Defendants

Doe brought her failure to train claim against PSD as well as Rattigan and DeBona, who

were both acting in their official capacities to the extent they planned, and/or failed to plan, PSD

employee Title IX training.  Compl. ¶¶ 68-74.  Because inclusion of the individual defendants in

this claim is merely redundant with the real party in interest, PSD, I will dismiss Doe's Count 3

failure to train claim against Defendants Rattigan and DeBona.  Hall v. Raech, No. 08-5020,

2009 WL 2009 WL 811503, at *3 (E.D. Pa. Mar. 25, 2009).

### 2.  Claim 4: Supervisory Liability Against Rattigan and DeBona

To establish supervisory liability against Rattigan and DeBona for her § 1983 hostile

environment claim, Doe must identify their "affirmative conduct."  Andrews, 895 F.2d at 1478.

This conduct can be that one or both "established and maintained a policy, practice or custom

which directly caused the constitutional harm," or "participated in violating Plaintiff's rights,

directed others to violate them, or, as the person in charge, had knowledge of and acquiesced to"

her subordinate's violations.  A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d

572, 585 (3d Cir. 2004).

Doe challenges the PSD policies of: (1) failing to notify the Title IX coordinator of all

harassment complaints; (2) failing to investigate all reports of harassment, regardless of where

they occur; and (3) failing to submit written reports of harassment investigations to the Title IX coordinator. Pl. Mem. at 19. Defendants deny such policies exist. Def. Resp. at 31-33. They also seek qualified immunity because, even if such conduct existed, it did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 503 (2019); McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

Doe's second theory – that PSD had an obligation to investigate the assault that Doe alleged occurred in her bedroom in April 2015 once it learned of the incident in June 2015 – fails as a matter of law. See Taylor v. Barkes, 135 S. Ct. 2042, 2045 (2015). Doe relies on Department of Education guidance that was in effect when she made her June 2015 complaint to argue she had a "clearly established" right to an investigation of alleged off-campus sexual violence. In an April 4, 2011 Dear Colleague letter, the Department of Education noted that, "[i]f a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures." Dep't of Educ. OCR, "Dear Colleague" Letter (April 4, 2011). Three years later, the Department reiterated that schools must "process all complaints of sexual violence, regardless of where the conduct occurred," and that "[t]he mere presence on campus or in an off-campus education program or activity of the alleged perpetrator of off-campus sexual violence can have continuing effects that create a hostile environment." 4/2014 Q&A at 29-30.

Nonetheless, there was no specific individual right to an investigation rooted in statutory or constitutional law. "Guidance letters do not enjoy Chevron deference." K.D. by & through Dunn v. Downingtown Area Sch. Dist., 904 F.3d 248, 255–56 (3d Cir. 2018) (citing Christensen v. Harris County, 529 U.S. 576, 586-87 (2000) and Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837

(1984)). Further, both guidances note they "do not add requirements to applicable law." 4/2011 Dear Colleague Letter at 1 n.1; 4/2014 Q&A at 1 n.1. Both also acknowledge the different legal standards applicable to administrative enforcement actions and private suits for monetary damages. 4/2011 Dear Colleague Letter at 4 n.12; 4/2014 Q&A at 1 n.9. Moreover, like the "Dear Colleague" letter discussed in K.D., the 2011 and 2014 Department of Education guidances neither reference nor explain a specific statutory or regulatory obligation. See 904 F.3d at 255-56.

Finally, both guidances were rescinded in 2017, in part because there was no notice and comment period before they were issued and in part because they constituted "a confusing and counterproductive set of regulatory mandates." Dep't of Educ. OCR, "Dear Colleague" Letter (Sept. 22, 2017). New guidance notes there is no "duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient," although schools are "responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities." Dep't of Educ. OCR, "Q&A on Campus Sexual Misconduct" (Sept. 2017). Therefore, even assuming the guidances were "'thorough[ly] ... consider[ed]' and 'valid[ly] ... reason[ed]' about the meaning of" Title IX, they did not "clearly establish" specific new procedural rights for sexual harassment victims. K.D., 904 F.3d at 256 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

In determining whether a specific right is "clearly established" for purposes of qualified immunity, a school's responsibility for sexual misconduct is limited by the extent to which they control the harasser and/or the harasser's environment. Davis, 526 U.S. at 644. Because of the tension between this requirement and the Department of Education guidance directing investigation of off-campus incidents, DeBona and Rattigan cannot be liable for violating a

"clearly established" right based solely on their failure to investigate Doe's April 2015 complaint of off-campus sexual violence. They are entitled to qualified immunity on that theory. Taylor, 135 S. Ct. at 2045.

The results are different for Doe's first and third theories of supervisory liability, which focus on PSD's alleged failure to implement its own Title IX policy. Doe asserts McHale never met with a student harassment victim during her time at PSD, and was never mentioned in PHS's 601 pages of reports documenting "sexual or gender-based derogatory term[s], gesture[s], or conduct" from the 2015-16 school year, or the 46 pages of discipline records classified as "harassment" between January 2014 and October 2017. Pl. Mem. at 22; see also Def. Ex. 25 at 40-42 (McHale only worked on two Title IX cases at PHS – one OCR complaint regarding funding of extra-curricular activities and the related Goodwin case). Defendants contend the 601 pages do not address sex-based harassment, and the 46 pages were investigated, just not by McHale. Def. Resp. at 31-32.

Defendants also contend Doe cannot show that DeBona's and/or Rattigan's conduct was "clearly unreasonable" and therefore evinced "deliberate indifference" to victims of sexual harassment. Barkes v. First Corr. Med., Inc., 766 F.3d 307 319-20 (3d Cir. 2014) (finding deliberate indifference when "a state official, by virtue of his or her own deliberate indifference to known deficiencies in a government policy or procedure, has allowed to develop an environment in which there is an unreasonable risk that a constitutional injury will occur, and that such an injury does occur"), overturned on another basis, Taylor, 135 S. Ct. at 2042.

Factual disputes preclude summary judgment. Viewed in the light most favorable to Doe, a reasonable jury could find Rattigan and DeBona violated "clearly established" Title IX law by failing to prevent a hostile environment when they intentionally: (1) failed to notify the

Title IX coordinator of Doe's complaints of sexual harassment; and (2) failed to provide the Title IX coordinator any sexual harassment investigation reports. 34 C.F.R. §106.8. A reasonable jury could find PHS administrators ratified a shadow procedure that failed to accurately categorize student complaints, thereby authorizing administrators to bypass PSD's Title IX policy. The evidence includes testimony by DeBona that could reasonably be considered evasive regarding the existence of this unwritten policy. Def. Ex. 9 at 226-34; see also supra at 15-16. It also includes the Title IX coordinator's admission that she heard of only two Title IX matters during her tenure at PHS and has never seen an investigation report.[9] Def. Ex. 25 at 39-42.

Title IX requires institutions to identify "at least one employee" responsible for "coordinat[ing]" its Title IX responsibilities. 34 C.F.R. § 106.8. Students must be able to identify this individual, id. § 106.8(a), and the process for making complaints under Title IX must be clear, id. § 106.8(b). To the extent McHale was designated to act as this individual, Doe was not informed. See id. § 106.8(a). To the extent that Hegen and other assistant principals filled this role, it is unclear how they were "designate[d]" to do so by PSD. See id. § 106.8; Policy No. 248. Dissemination of information about the "protection against discrimination assured . . . by Title IX" is a large part of the statute's requirements, and to the extent that PSD's

---

[9]     A reasonable jury also could find that the unwritten policies existed based in part on evidence from the disciplinary files. For example, in October 2015, concurrent with the complaints made by Doe, a student complained about other students who, "[o]ver the months of September, and now a portion of October . . . have repeatedly called me Retarded, gay, a faggot (Pardon the language), and multiple other malicious and degrading terms including the word Coon . . . pushed, shoved and hit me on multiple occasions." Def. Ex. 14 at Doe-PSD003246. Email correspondence regarding this incident between a teacher and two administrators suggests that the teacher believed those activities constituted harassment and violated PSD policy, and that PSD was reluctant to invoke its anti-harassment policy. Id. at Doe-PSD003245 ("It is now time for the district to step up and enforce the policy it has spent so much time and effort promoting"). This incident, which implicates sex- and race-based harassment, was never brought to McHale's attention, as it should have been under PSD Policy No. 248.

procedure relied on opaque unwritten rules and procedures, a reasonable jury could find those people responsible for the policies liable for the ensuing hostile environment.  See Hill v. Cundiff, 797 F.3d 948, 973-74 (11th Cir. 2015) (denying summary judgment based, in part, on district's policies of (1) allowing ad hoc categorization of disciplinary issues, and (2) requiring an enhanced burden of proof for sexual harassment allegations).  A reasonable jury could find Defendants' conduct violated this clearly established law, thereby precluding qualified immunity.

Plaintiff's motion for summary judgment requires viewing the facts in the light most favorable to Defendants.  Alford, 2008 WL 2329101, at *3.  Viewed in this light, there were other reasons the harassment complaints never came to the attention of the Title IX coordinator.  A reasonable jury could find that emails show Doe's complaints were not investigated because she has a long history of peer conflict, including as the perceived aggressor, failed to provide sufficient detail to allow investigation of alleged sexual harassment, and that her complaints were reasonably discounted based on prior incidents of untruthfulness.  See, e.g., Def. Ex. 142 (Doe asked to switch programs, then told her grandmother she was being forced to switch programs, and regularly complained to administrators about bullying and/or harassment without "provid[ng] any specifics").

Because material facts regarding the existence of an unwritten policy and PSD's adherence to its written policy are disputed, the parties' cross-motions for summary judgment are denied.

An appropriate Order follows.